## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## DAVENPORT DIVISION

|  |  |
|---|---|
| **GENERAL MOTORS LLC,** | |
| **Plaintiff,** | **Civil Action No.** |
| **v.** | **Judge _____** |
| **LEEP CHEV, LLC d/b/a LUJACK CHEVROLET,** | **JURY DEMAND ENDORSED HEREON** |
| **Defendant.** | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE AND OTHER RELIEF

For its complaint against Leep Chev, LLC d/b/a Lujack Chevrolet ("Dealer"), Plaintiff General Motors LLC ("GM") states or alleges as follows:

## I.    INTRODUCTION

1.    By this action, GM seeks to enforce a settlement agreement that the parties entered into to resolve pending litigation.  The enforceability of such agreements is important to the judicial system and such agreements are strongly favored as a matter of public policy.  In May 2010, Dealer and GM were involved in litigation that originated out of earlier bankruptcy proceedings and continued under federal legislation passed by Congress.  *See* § 747 of the Consolidated Appropriations Act 2010, Pub. Law 111-117, 123 Stat. 3034 (2009) ("Dealer Arbitration Act" or "Section 747").  To resolve that litigation, Dealer and GM negotiated and executed an Option Agreement to Resolve Pending Arbitration ("Settlement Agreement") related to the Dealer's dealership operations.  The Settlement Agreement provides that if Dealer fails to meet certain requirements, GM may exercise its option to purchase designated dealership assets

under the terms set forth in the Settlement Agreement. Dealer subsequently failed to meet requirements it agreed to under the Settlement Agreement, and now refuses to carry out its obligations under the Settlement Agreement. GM is therefore filing this action to enforce its contractual rights under the Settlement Agreement.

2.     GM previously filed a separate action related to Leep's fraudulent and improper activities in connection with purported sales and the related reporting of alleged Retail deliveries of new Chevrolet vehicles, the "Daisy Chain" scheme. As set forth in filings in that other matter, Leep engaged in a widespread scheme to falsely report Retail deliveries that were not bona fide sales as claimed, but were instead sham transactions. Indeed, in many if not all cases the purported purchasers never drove any of the vehicles they reportedly "purchased" off the lot. Leep's false reports of Retail deliveries were designed to inflate Leep's retail sales performance so that Leep would appear to meet its Performance Requirement under the Settlement Agreement. Based on GM's most recent audit and the other information now available, Leep clearly failed to meet its agreed upon Performance Requirement. GM thus has the right to purchase designated assets under the Settlement Agreement. GM therefore exercised its purchase option under the Settlement Agreement, but Leep refuses to agree to proceed to close on the sale and purchase of the subject assets.

## PARTIES

3.     On information and belief, Dealer is a limited liability company organized in Iowa, with its principal place of business for dealership operations at 3700 N. Harrison Street, Davenport, Iowa 52806-5905.

4.     General Motors LLC is a Delaware limited liability company, the sole member of which is General Motors Holdings LLC, also a Delaware limited liability company. The sole member of General Motors Holdings LLC is General Motors Company, a corporation

- 2 -

organized under the laws of the State of Delaware with its principal place of business in

Michigan.  General Motors LLC and General Motors Holdings LLC also maintain their principal

places of business in Michigan.

### JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1332

because it involves citizens of different states and the amount in controversy is substantially

greater than $75,000.  The amount in controversy includes, among other things, (i) GM's request

for indemnification, attorney fees, and damages associated with Leep's failure to agree to

comply with the terms of the Settlement Agreement, (ii) the price of the Eligible Items GM is

required to purchase from Dealer under the Settlement Agreement and exhibits thereto; and

(iii) any other amounts at issue under applicable law.

6.      Further, this Court has jurisdiction over this action under 28 U.S.C. § 1331

and 1334.  GM's Complaint seeks to enforce the federal interests that underlie the Settlement

Agreement.  As set forth below, failure to abide by the Settlement Agreement would undermine

three federal interests:  (1) federal bankruptcy court orders and proceedings; (2) the enforcement

of the parties' Wind-Down Agreement, which was reviewed and approved under federal

bankruptcy law; and (3) the interests served by Section 747, which recognized the enforceability

of settlement agreements to resolve disputes arising under that federal statute.

7.      As set forth below, the orders and agreements entered or approved by the

Bankruptcy Court for the United States District Court for the Southern District of New York

("Bankruptcy Court") should be given full force and effect through the enforcement of the

parties' Settlement Agreement or through the enforcement of such orders and agreements.  *See*

*Striff v. Mason*, 849 F.2d 240 (6th Cir. 1988) (finding federal court jurisdiction because

complaint was related to settlement of a "federal action" and because relief sought "had a direct

- 3 -

and adverse impact upon [a] federal court decree enforcing federal civil rights laws"), *overruled on other grounds*, *Martin v. Wilks,* 490 U.S. 755 (1989), *superseded by statute*, Civil Rights Act of 1964, Pub. Law 88-352, 78 Stat. 241.

8.      In addition, as set forth below, this Court should enforce the federal interests underlying the Dealer Arbitration Act. The act recognizes the enforceability of voluntary agreements entered into to resolve arbitration proceedings held pursuant to the statute. *See* § 747(f); *see generally Grable & Sons Metal Prods., Inc., v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) (discussing considerations of federal question jurisdiction and stating that "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues"); *Harrison v. Christus St. Patrick Hosp.*, 432 F. Supp. 2d 648, 650-51 (W.D. La. 2006) (federal question jurisdiction may exist where resolution of state law cause of action necessarily turns on some construction of federal law).

9.      Venue is proper in this District because, among other things, Dealer resides in this District. *See, e.g.*, 28 U.S.C. § 1391(b)(1).

## II.      BACKGROUND

### A.      Bankruptcy Proceedings

10.      As previously reported in the press, Motors Liquidation Company, previously known as General Motors Corporation (hereafter "GMCorp"), encountered distress as a result of a deterioration in the credit markets and other forces, and on June 1, 2009, filed a voluntary Chapter 11 petition for relief in the Bankruptcy Court. To preserve the value of its assets, GMCorp sold the bulk of its assets to a new company with new ownership. The alternative to the Court-approved sale in bankruptcy was liquidation, which would have had "appalling consequences for [GMCorp's] creditors, its employees, and our nation." *In re Gen. Motors Corp.*, 2009 U.S. Dist. Lexis 61279, at *1 (S.D.N.Y. July 9, 2009).

- 4 -

11.     After notice and a lengthy evidentiary hearing, on July 5, 2009, the Bankruptcy Court entered an order approving the sale of assets subject to certain terms and conditions (the "363 Sale Order").  *See In re General Motors Corp.*, No. 09-50026, 2009 Bankr. LEXIS 5565 (Bankr. S.D.N.Y. July 5, 2009).  The 363 Sale Order, *inter alia*, authorized and approved the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009 (the "MSPA") for the sale of certain assets.  Pursuant to the MSPA and the 363 Sale Order, the designated purchaser, which through subsequent transactions became GM, purchased substantially all of the assets of GMCorp free and clear of MLC's liabilities, except those expressly assumed under the MSPA.

**B.     Interests Sold Free And Clear**

12.     The Bankruptcy Court found that "[t]he transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets *free and clear of liens, claims, encumbrances, and other interests (other than Permitted Encumbrances)* . . . ."  Id. at *22-23 (emphasis added).  The same order provided that "[t]he Sellers may sell the Purchased Assets *free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances)*, . . . ."  *Id.* at *24 (emphasis added).  The Bankruptcy Court further found that "[t]he Purchaser would not have entered into the MPA [MSPA] and would not consummate the 363 Transaction (i) if the sale of the Purchased Assets was not free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances) . . . ."  *Id* at *26; *see also In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009); *accord In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd*, *Ind. State Police Pension Trust v. Chrysler LLC (In re*

*Chrysler LLC)*, 576 F.3d 108 (2d Cir. 2009), *2d Cir. decision vacated as moot*, 130 S. Ct. 1015 (2009).

**C.     The Interests Of Dealer And Other Non-Retained Dealers Were Adjudicated By The Sale Order**

13.     The Section 363 Sale allowed certain steps to be taken to restructure the GMCorp dealer network so that the purchaser of its assets could compete more effectively in the automotive industry.  To this end, GMCorp, government officials, the Auto Task Force, and industry commentators determined that, in certain markets and under certain circumstances, the dealer network should be strengthened, realigned, and modernized.

14.     In connection with the bankruptcy proceedings, GMCorp reviewed dealer performance to identify poorly performing dealers and analyzed other factors to select those dealers that would not become part of the revamped dealer network.  GMCorp offered these non-retained dealers Wind-Down Agreements, which provided monetary payments and allowed these dealers to continue selling and servicing General Motors vehicles under certain conditions until October 31, 2010, when their dealer agreements would expire.  The Wind-Down Agreements were later assigned to GM pursuant to the terms of the 363 Sale Order and subsequent transactions.  The Bankruptcy Court approved the Wind-Down Agreements and specifically found in Paragraph 31 of the 363 Sale Order that these agreements "represent[ed] valid and binding contracts, enforceable in accordance with their terms."  2009 Bankr. LEXIS 565, at *59; *see also In re Gen. Motors Corp.*, 407 B.R. at 513-14.

**D.     Dealer Enters Into a Valid Wind-Down Agreement**

15.     Before GMCorp filed for bankruptcy, Dealer operated an authorized Chevrolet dealership in Davenport, Iowa pursuant to a Dealer Sales and Service Agreement ("Dealer Agreement").  In the bankruptcy proceedings, GMCorp decided not to retain Dealer as

an authorized Chevrolet dealer.  As an alternative to outright rejection of the Dealer Agreement,

GMCorp offered a Wind-Down Agreement to Dealer, which Dealer accepted, executed and

returned to GMCorp in June 2009.  Under this agreement, Dealer agreed, among other things, to

cease its Chevrolet dealership operations no later than October 31, 2010.  Dealer's Wind-Down

Agreement, attached as Exhibit 1, was later assigned to GM under the terms of the 363 Sale and

subsequent transactions.  (GM is filing a motion for leave to file exhibits under seal.)

### E.    The Dealer Arbitration Act Leads To The Settlement Agreement

16.    After the 363 Sale, the non-retained dealers sought relief from Congress,

which passed legislation that gave "wind-down" dealers the opportunity to seek reinstatement to

the GM dealer network through binding arbitration.  *See generally* § 747.

17.    Dealer took advantage of this opportunity and filed a demand for

arbitration pursuant to the Dealer Arbitration Act.  Prior to a trial on the merits, Dealer and GM

agreed to settle Dealer's arbitration claim and entered into the Settlement Agreement, which

reinstated Dealer as an authorized Chevrolet dealer for a period of time, under the terms and

conditions of the Settlement Agreement.  A copy of the Settlement Agreement is attached as

Exhibit 2, and a copy of the referenced First Amendment to Wind-Down Agreement is attached

as Exhibit 3.

18.    Section 747 expressly authorizes settlement agreements to resolve the

arbitrations.  *See* § 747(f).  The Settlement Agreement was implemented through, and was

contingent on, an amendment to Dealer's Wind-Down Agreement, entitled First Amendment to

Wind-Down Agreement.  *See* Exhibit 3.  The amendment did not alter the provision relating to

the Bankruptcy Court's exclusive jurisdiction.  Ex. 3.

19.    The Settlement Agreement also references the Wind-Down Agreement.

For example, Section 5 provides that Dealer "expressly ratifies and affirms the Wind-Down

- 7 -

Agreement (as amended by the Wind-Down Amendment) entered into or to be entered into by Dealer, and agrees that each such agreement is, or if not yet executed by Dealer, upon such execution shall be, of full force and effect . . ."  Ex. 2, Paragraph 5.

20.     The Settlement Agreement specifically acknowledges (1) that the settlement resolved "the [Dealer's] Arbitration Claim proceeding," and (2) that, as a result of the settlement, Dealer "dismisses with prejudice and forever waives all of its rights in connection with the Arbitration Claim."  *See* Exhibit 3 at Paragraph B; Paragraph 5.

21.     Dealer agreed in the Settlement Agreement to, among other things, achieve an aggregate Retail Sales Index ("RSI") of at least 85 for the period January 1, 2011 through December 31, 2012.  *See* Exhibit 3 at ¶¶ 1(f), (g), 12.  This RSI requirement of 85 is substantially below average  -- an RSI score of 100 is an average level performance.

22.     Moreover, the Settlement Agreement provides for specific remedies if Dealer breaches the Settlement Agreement.  *See id*. at ¶ 15.  Specifically, Dealer agreed that the "Dealer shall, upon written demand by GM, sell all of the assets" identified in the exhibits to the Settlement Agreement.  *See id*. at ¶ 15(a)(ii).  The Settlement Agreement also specifies the purchase price and other details related to GM's exercise of the option.  *See id*. at ¶ 16.

23.     The Settlement Agreement further provides that upon Dealer's breach, "GM shall be entitled to recover all costs and expenses incurred in order to enforce this Agreement, including, without limitation, reasonable filing fees, costs, expenses, expert fees and attorneys' fees."  *Id*. at ¶ 15(a)(iii); *see also id*. at ¶ 19(c).

24.     Dealer engaged in an extensive fraudulent scheme pursuant to which Dealer fraudulently or improperly reported to GM as Retail deliveries hundreds of purported sales that were not bona fide sales at all.  Rather, the purported sales included many sham

transactions to employees of Dealer or Leep Affiliated Dealerships.  On information and belief, Dealer or Leep Affiliated Dealerships funded the employees' "purchases" and some of the purported customers never even sat in the vehicles they purported to "buy," never drove the vehicles, and never even set eyes on the vehicles.  The Daisy Chain transactions instead constituted fraudulent "paperwork," falsely or otherwise improperly reported to GM as genuine Retail deliveries.  They were not bona fide Retail deliveries, but Leep nevertheless reported them to GM as Retail deliveries.

25.     A dealer's reported Retail deliveries to GM is significant because the reported Retail deliveries are used to determine a dealer's RSI.  The RSI, in turn, was used to determine whether Leep met its sales Performance Requirement under the Settlement Agreement.  Because the Daisy Chain vehicles were not Retail deliveries, they must be excluded from Leep's retail sales performance under the Performance Requirement of the Settlement Agreement.

26.     In any event, even if such "sales" somehow constitute anything other than fraudulent reports, the "sales" are expressly prohibited by the Dealer Agreement, as the Dealer Agreement prohibits sale-for-resale transactions.  Thus, at best, the reported "sales" constitute unauthorized transactions that were clear breaches of the Dealer Agreement.

27.     When the fraudulent or otherwise improperly reported Daisy Chain "sales" are excluded, Dealer clearly failed to meet the Performance Requirement of the Settlement Agreement.  Thus, on April 19, 2013 GM provided written notice to Dealer of GM's exercise of the option to purchase certain of Dealer's assets based upon Dealer's failure to meet the RSI requirement of the Settlement Agreement.  A copy of GM's written notice is attached as Exhibit 4.  GM representatives met with the Dealer Operator and provided a copy of the written

notice.  Leep indicated that it would not agree to comply with the terms of the Settlement Agreement as requested by GM.

## COUNT I:  DECLARATORY JUDGMENT: SETTLEMENT AGREEMENT

28.    GM restates the allegations contained in the foregoing paragraphs as if fully restated here.

29.    The Settlement Agreement expressly allows GM to exercise an option to purchase certain assets upon Dealer's breach of the Settlement Agreement.

30.    The parties to this action are the parties to the Settlement Agreement and thus have an interest that may be affected by the declaration requested.

31.    This action is within the jurisdiction of the Court and GM is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

32.    A controversy has arisen and now exists between the parties regarding the enforceability of the Settlement Agreement, including GM's right to purchase the designated assets.  The controversy is real and justiciable, and speedy relief is necessary to preserve the parties' respective rights.

33.    GM has complied with the requirements of the Settlement Agreement and has exercised its option to purchase certain of Dealer's assets.  Leep indicated that it would not agree to comply with the terms of the Settlement Agreement as requested by GM.

34.    Accordingly, this Court should enforce the terms of the Settlement Agreement, determine that Dealer is obligated to comply with its provisions, and declare that no other statutes apply to limit or restrict the enforceability of the Settlement Agreement.

35.    In the event this Court finds that the Settlement Agreement should not be enforced for any reason, GM requests that this Court enforce the Court orders entered in the United States Bankruptcy Court for the Southern District of New York (and any related appeals)

- 10 -

and the terms of the parties' Wind-Down Agreement.  Those orders and approved agreements preempt any contrary state provisions.  Dealer cannot seek to escape the terms of the Settlement Agreement and seek to circumvent the federal interests, federal court orders and federal law underlying the Settlement Agreement.  Similarly, Dealer cannot sign the Settlement Agreement under Section 747 and then attempt to turn around and argue that the Settlement Agreement is defective or otherwise unenforceable.

36.     Unless this Court declares that GM is entitled to enforce the provisions of the Settlement Agreement, GM will continue to suffer prejudice to its rights and substantial harm.

37.     GM has performed the valid conditions, covenants, and obligations required under the Settlement Agreement and applicable law.

WHEREFORE, GM is entitled to a declaration under 28 U.S.C. §§ 2201 and 2202 that (1) the Settlement Agreement is valid, (2) GM has the right to purchase the designated assets pursuant to the terms of the Settlement Agreement, (3) Dealer's actions are contrary to the Settlement Agreement and are contrary to law, (4) Dealer has no claim for relief under the Settlement Agreement, and (5) no other statutes apply to, limit or restrict the enforceability of the Settlement Agreement.

## COUNT II:  BREACH OF SETTLEMENT AGREEMENT

38.     GM restates the allegations contained in the foregoing paragraphs as if fully restated here.

39.     The Settlement Agreement between GM and Dealer is a valid, binding contract.

40.     GM has performed its obligations under the terms of the Settlement Agreement.

COI-1491170v8

41.     Paragraph 15(a)(iii) of the Settlement Agreement expressly provides that if Dealer breaches the Settlement Agreement, GM is entitled to recover all costs and expenses incurred to enforce the Settlement Agreement, including attorney fees.  In addition, paragraph 19(c) also requires Dealer to indemnify GM for, among other things, costs and expenses arising from, relating to or caused by Dealer's breach of the Settlement Agreement.

42.     Dealer has breached or anticipatorily breached the Settlement Agreement by, among other things, failing to fulfill the agreed upon performance requirement and indicating that it would not agree to comply with the terms of the Settlement Agreement as requested by GM.

43.     Dealer's breaches or anticipatory breaches have caused or will cause delays in GM's purchase of the Dealer's designated assets, have forced GM to incur attorney fees and costs, and will further damage GM and cause additional disruptions, lost employee time, and additional expenses incurred as a result of such breaches.

WHEREFORE, GM is entitled to an award of any damages, including attorney fees and costs, to the extent permitted by applicable law, incurred as a result of Dealer's breaches or anticipatory breaches of the Settlement Agreement, along with any other relief to which GM may be entitled under applicable law

## COUNT III:  SPECIFIC PERFORMANCE OF SETTLEMENT AGREEMENT

44.     GM restates the allegations contained in the foregoing paragraphs as if fully restated here.

45.     The Settlement Agreement is a valid, binding and enforceable contract.

46.     Dealer has breached or anticipatorily breached the Settlement Agreement as set forth above and has refused to proceed to sell the designated assets to GM as required by the Settlement Agreement.  Those assets are discussed further below.

- 12 -

47.     Dealer's assets that GM is entitled to purchase under the Settlement Agreement include intangible assets (for example, goodwill and other specified intangible assets) that are unique and cannot be acquired from any other source.

48.     GM has complied with all of the Settlement Agreement's requirements and  given proper notice that it is exercising its option to purchase the designated assets.  Dealer, however, has refused to abide by the Settlement Agreement and thereby blocked GM's exercise of its lawful rights under the Settlement Agreement.  Accordingly, the Court should enforce the Settlement Agreement.

49.     Dealer's breach is also causing irreparable injury to GM because the breach is preventing GM from purchasing the designated assets, which include unique assets, such as the dealership's goodwill and other specified intangible assets.  *See* Exhibit C to Settlement Agreement (listing assets as, among other things, goodwill and other specified assets).  GM is entitled to specific performance to purchase the designated assets.  Dealer's breach also threatens GM with irreparable harm by forcing GM to retain a dealer that has failed to meet the minimal performance requirements of its Settlement Agreement and has harmed GM's brand.  Dealer also continues to impose irreparable harm through its failure to abide by the terms of its contractual agreement and through other means.

50.     GM has no adequate remedy at law, as damages will not adequately compensate it for Dealer's breach.

51.     GM has performed, and stands ready to perform, its obligations under the Settlement Agreement upon a judgment and decree from this Court ordering Dealer to specifically perform is obligations under the Settlement Agreement.

- 13 -

52.     WHEREFORE, GM is entitled to an order requiring Dealer to specifically perform its obligations under the Settlement Agreement.

## COUNT IV:  INDEMNIFICATION

53.     GM restates the allegations contained in the foregoing paragraphs as if fully restated here.

54.     The Settlement Agreement is a valid and binding contract.  The Settlement Agreement requires Leep to indemnify GM for, among other things, GM's attorney fees upon Leep's breach of the Settlement Agreement.

55.     As set forth above, Leep failed to meet its performance requirements under the Settlement Agreement.  Accordingly, GM provided notice to Leep that GM was exercising its option to purchase certain designated assets under the Settlement Agreement.  Yet, Leep has indicated that it will not close on the sale of assets required by the Settlement Agreement and has thereby breached the Settlement Agreement.  Accordingly, GM is entitled to any and all indemnification rights it has under the Settlement Agreement.

WHEREFORE, GM is entitled to an award of any damages, including attorney fees and costs, to the extent permitted by applicable law, incurred as a result of Dealer's breaches or anticipatory breaches of the Settlement Agreement, along with any other relief to which GM may be entitled under applicable law.

## COUNT V:  PRELIMINARY AND PERMANENT INJUNCTION

56.     GM restates the allegations contained in the foregoing paragraphs as if fully restated here.

57.     The Settlement Agreement is a valid and binding contract.

58.     As set forth above, the Settlement Agreement contains provisions that bar Dealer's actions.

59.     Under Paragraph 15(a)(i) of the Settlement Agreement, GM is entitled to all of its rights and remedies at law or in equity, including the right to specifically enforce the Settlement Agreement.  Accordingly, GM is entitled to a preliminary and permanent injunction enjoining Dealer from any further conduct inconsistent with the requirements of the Settlement Agreement, and enjoining Dealer from any further conduct interfering with GM's exercise of its option.

WHEREFORE, GM requests preliminary and permanent injunctive relief in accordance with the terms of the Settlement Agreement and enjoining Dealer from any further action inconsistent with the terms of the Settlement Agreement.

## PRAYER FOR RELIEF

Accordingly, GM seeks the following relief:

1. A declaration that the Settlement Agreement is valid and binding, that GM has the right to purchase the designated assets pursuant to the terms of the Settlement Agreement, that Dealer's actions are contrary to the Settlement Agreement and are barred as a matter of law, that Dealer has no claim for relief under the Settlement Agreement, and that no other statutes apply to, limit or restrict the enforceability of the Settlement Agreement;

2. An order requiring Dealer to specifically perform the Dealer's obligations under the Settlement Agreement;

3. Judgment in favor of GM and against Dealer in an amount equal to GM's recoverable damages, including attorney fees and costs, to the extent permitted by applicable law, and other damages incurred in this litigation or otherwise to the extent permitted by applicable law;

4. An order requiring Leep to indemnify GM for all fees and expenses allowable under the Settlement Agreement;

5. An order enjoining Dealer from any further interference with GM's exercise of its option to purchase and/or other rights under the Settlement Agreement;

6. An award of pre-judgment and post-judgment interest on the amount of the judgment; and

COI-1491170v8

7.   Any other and further relief, in equity or at law, that the Court deems just and proper.

Respectfully submitted,

/s/ Robert V.P. Waterman, Jr.

Robert V.P. Waterman, Jr.
Abbey C. Furlong
LANE & WATERMAN LLP
220 North Main Street, Suite 600
Davenport, IA  52801-1987
Telephone:  (563) 324-3246
Fax:  (563) 324-1616
Email: bwaterman@L-WLaw.com
Email: afurlong@L-WLaw.com

OF COUNSEL (pro hac vice applications
forthcoming)
Jeffrey J. Jones (Ohio 0030059)
 jjjones@jonesday.com
J. Todd Kennard (Ohio 0068441)
 jtkennard@jonesday.com
Melissa D. Palmisciano (OHIO 0080027)
 mpalmisciano@jonesday.com
JONES DAY
Street Address:
325 John H. McConnell Boulevard, Suite 600
Columbus, OH  43215-2673
Mailing Address:
P.O. Box 165017
Columbus, OH  43216-5017
Telephone:  (614) 469-3939
Fax:  (614) 461-4198

*Attorneys for General Motors LLC*

COI-1491170v8

## **JURY DEMAND**

GM hereby demands a jury trial of the maximum number of jurors permitted by law on any issues triable to a jury.

Respectfully submitted,


/s/ Robert V.P. Waterman, Jr.
Robert V.P. Waterman, Jr.
Abbey C. Furlong
LANE & WATERMAN LLP
220 North Main Street, Suite 600
Davenport, IA  52801-1987
Telephone:  (563) 324-3246
Fax:  (563) 324-1616
Email: bwaterman@L-WLaw.com
Email: afurlong@L-WLaw.com


OF COUNSEL (pro hac vice applications
forthcoming)
Jeffrey J. Jones (Ohio 0030059)
 jjjones@jonesday.com
J. Todd Kennard (Ohio 0068441)
 jtkennard@jonesday.com
Melissa D. Palmisciano (OHIO 0080027)
 mpalmisciano@jonesday.com
JONES DAY
Street Address:
325 John H. McConnell Boulevard, Suite 600
Columbus, OH  43215-2673
Mailing Address:
P.O. Box 165017
Columbus, OH  43216-5017
Telephone:  (614) 469-3939
Fax:  (614) 461-4198

*Attorneys for General Motors LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served in accordance with applicable

rules upon the following:

Leep Chev, LLC d/b/a Lujack Chevrolet
3700 North Harrison Street
Davenport, Iowa 52806-5905

Leep Chev, LLC d/b/a Lujack Chevrolet
c/o James H. Arenson
425 2nd Street SE, Ste 900
Cedar Rapids, Iowa 52401

Dated:   19th day of April, 2013

Robert V.P. Waterman, Jr. _____
One of the Attorneys Representing Plaintiff
General Motors LLC